UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-                        21-CR-255 (NSR)

DARNELL KING,

           Defendant.

------------------------------------------------------------X

Memorandum of Darnell King in Support of Pre-Trial Motions

Theodore S. Green
*Attorney for Darnell King*
Green & Willstatter
200 Mamaroneck Avenue - Suite 605
White Plains, New York   10601
(914) 948-5656
theosgreen@msn.com

cc: All counsel (by ECF)

This memorandum is submitted in support of the pre-trial motions of Darnell King for orders:

1.  Directing disclosure of identification procedures and identifications that the government proposes to offer at trial and suppressing or precluding any such pre-trial identifications and in-court identification testimony, on the ground that the pre-trial identifications were made under unnecessarily suggestive circumstances and lack independent reliability in violation of defendant's right to a fair trial as guaranteed by U.S. Const., Amends. V and VI, or, alternatively, directing a *Wade* hearing;

2.  Precluding or limiting opinion testimony regarding firearm toolmark analysis; and

3.  Dismissing the indictment on the ground that 18 U.S.C. § 922(g) is unconstitutional. U.S. Const., Amend. II.

**I. Identification evidence**

Due process protects "the right not to be the object of suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification." *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992) (internal quotation marks omitted).

Our Circuit has "consistently condemned the exhibition of a single photograph as a suggestive practice, and, where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one." *See United States ex rel. John v. Casscles*, 489 F.2d 20 (2d Cir. 1973), cert. denied, 416 U.S. 959, 40 L. Ed. 2d 310, 94 S. Ct. 1976 (1974); *United States v. Reid*, 517 F.2d 953, 966 (2d Cir. 1975); *United States ex rel. Gonzalez v. Zelker*, 477 F.2d 797, 801 (2d Cir. 1973), cert. denied, 414 U.S. 924, 94 S. Ct. 254, 38 L. Ed. 2d 158 (1974). *Mysholowksy v. New York,* 553 F.2d 194, 197 (2d Cir. 1976); *United States v. Diaz*, 986 F.3d 202, 206-207 (2d Cir. 2021).

If the procedures used to obtain an identification are unduly suggestive, "due process requires that the identification testimony be excluded unless a threshold level of reliability can be established through evidence that is independent of the suggestive procedure." *Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir. 1998), abrogated on other grounds by *Perry v. New Hampshire*, 565 U.S. 228, 248, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012).

In determining whether or not there exists independent reliability, the Supreme Court has set out the following factors to consider: [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

As an initial matter, the government here should be directed to disclose to the defense what pre-trial identification procedures were conducted with respect to any identification evidence that and testimony that the government will seek to introduce at trial.  This would include having a potential witness view a single photograph, a photo array, video recordings, still shots from video recordings, and corporeal identifications such as lineups and showups.

Following the government disclosure, we would seek a hearing on whether any pre-trial identification procedures were unnecessarily suggestive, and a determination whether any out-of-court identifications and/or identification testimony should be precluded as not independently reliable.

## II.   Testimony regarding firearm and cartridge case toolmark examinations should be precluded or limited

Under Federal Rule of Evidence 702, a witness may testify as an expert if they are qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. If a witness qualifies as an expert, Rule 702 allows for their testimony when:

a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

b) the testimony is based on sufficient facts or data;

c) the testimony is the product of reliable principles and methods; and

d) the expert has reliably applied the principles and methods to the facts of the case.

Under, *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Court has a gatekeeping function of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The court's gatekeeping role extends "not only to testimony based on 'scientific' knowledge, but  also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141,(1999) (quoting Fed. R. Evid. 702).

To gauge the reliability of proffered testimony, "the district court should consider the indicia of reliability identified in Rule 702," which are not exhaustive. *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004). Courts also consider the five additional factors listed in *Daubert*, *i.e.*: (1) "whether [the] theory or technique . . . can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review or publication;" (3) "in the case of a particular scientific technique, the known or potential rate of error," (4) "the existence and maintenance of standards

3

controlling the technique's operation;" and (5) whether a particular technique or theory has gained "general acceptance." *Daubert*, 509 U.S. at 593-94.

Discussing these factors, in *United States v. Adams*, 444 F. Supp. 3d 1248 (D. Oregon 2020) the *Adams* court wrote:

> The first factor, testability, refers to whether a methodology is falsifiable and replicable. *Daubert*, 509 U.S. at 593. This is what "distinguishes science from other fields of human inquiry." Id. (internal quotations omitted). Second, the peer review factor, asks whether a methodology or hypothesis has been published to the scientific community for the purpose of detecting substantive flaws. Id. This factor is relevant but not dispositive. Id. at 594. Third and fourth, the error rate and the standards controlling the technique's operation, are also not dispositive but are probative of whether a method is reliable. Id. Finally, "general acceptance" in the scientific community does not refer to any particular rate of acceptance, but a technique that has attracted only minimal support in the scientific community "may properly be viewed with skepticism." *Id*. (*citing United States v. Downing*, 753 F.2d 1224, 1238 (3rd Cir. 1985) (citation omitted)).

*Adams* at 1257-58.

"[T]o 'warrant admissibility[,] it is critical that an expert's analysis be reliable at every step.'" *United States v. Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) (summary order) (quoting *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002)). Expert testimony may be excluded if "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In the present case, the government has provided documentation from the firearms section of the Westchester County department of public safety concerning examination of a firearm and discharged cartridge casings. The analyst reports comparing two discharged cartridge casings

received as "evidence" with other cartridge casings that were test-fired from the firearm.   He claims

that the "evidence" cartridge casings and the test-fired casings "are all identified as having been fired

by" the subject firearm.  His report elsewhere indicates that this conclusion is based on a comparison

of "toolmarks".

*United States v. Otero*, 849 F. Supp. 2d 425 (D.N.J. 2012), aff'd, 557 F. App'x 146 (3d Cir.

2014) described the underlying theory of toolmark analysis as follows:

> Toolmark identification is based on the theory that tools used in the manufacture of a firearm leave distinct marks on various firearm components, such as the barrel, breech face or firing pin. The theory further posits that the marks are individualized to a particular firearm through changes the tool undergoes each time it cuts and scrapes metal to create an item in the production of the weapon. Toolmark identification thus rests on the premise that any two manufactured products, even those produced consecutively off the same production line, will bear microscopically different marks. With regard to firearms, these toolmarks are transferred to the surface of a bullet or shell casing in the process of firearm discharge. Depending on the tool and the type of impact it makes on the bullet or casing, these surface marks consist of either contour scratch lines, known as striations (or striae), or impressions. For example, rifling  (spiraled indentations) inside of a gun barrel will leave raised and depressed striae, known as lands and grooves, on the bullet as it is fired from the weapon, whereas the striking of the firing pin against the base of the cartridge, which initiates discharge of the ammunition, will leave an impression but not striae. . . . .

> An examiner observes three types of characteristics on spent bullets  or cartridges: class, subclass and individual. Class characteristics are gross features common to most if not all bullets and cartridge cases fired from a type of firearm, for example, the caliber and the number of lands and grooves on a bullet. Individual characteristics are microscopic markings produced in the manufacturing process by the random imperfections of tool surfaces (the constantly changing tool as described

above) and by use of and/or damage to the gun post-manufacture. . . . Subclass characteristics generally fill the gap between the class and individual characteristics categories. They are produced incidental to manufacture but apply only to a subset of the firearms produced, for example, as may occur when a batch of barrels is formed by the same irregular tool.

*Id.*

In *Adams*, 444 F. Supp. 3d 1248, and *United States v. Shipp*, 422 F. Supp. 3d 762 (E.D.N.Y. 2019), the Courts applied the *Daubert* factors to toolmark evidence. We discuss the factors here:

**Replicability**

In finding a lack of replicability in toolmark analysis, the *Adams*, court noted that the analyst's *Daubert*-hearing testimony evidenced a "lack of any objective standard" in comparing toolmarks and that "this flaw in [the analyst's] testimony appears to derive from the AFTE [Association of Firearm and Tool Mark Examiners] methodology itself, not from any deficiency in [the analyst's] understanding of his work. AFTE requires an examiner to find 'sufficient agreement' between crime scene shells and test fired shells from the firearm in question in order to determine a match." *Adams* at 1260. The Court then quoted *Shipp*'s explanation of why "sufficient agreement" is not an objective standard:

First, the sufficient agreement standard is circular and subjective. Reduced to its simplest terms, the AFTE Theory "declares that an examiner may state that two toolmarks have a 'common origin' when their features are in 'sufficient agreement.'" PCAST Report at 60.[1] "It then defines 'sufficient agreement' as occurring when the

_____

[1]President's Council of Advisors on Sci. & Tech., *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature Comparison Methods*, 46 (2016) ("PCAST Report"). (available at https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_ science_report_final.pdf).

examiner considers it a 'practical impossibility' that the toolmarks have different origins." Id. The NRC Report notes that the AFTE Theory "is the best guidance available for the field of toolmark identification, [but] does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence." NRC Report at 155. Without guidance as to the extent of commonality necessary to find "sufficient agreement," the AFTE Theory instructs examiners to draw identification conclusions from what is essentially a hunch—a hunch "based on the examiner's training and experience," AFTE Revised Theory of Identification, 43 AFTE Journal at 287—but still a hunch.

Moreover, the application of this circular standard is "subjective in nature ... based   on the examiner's training and experience." AFTE Revised Theory of Identification, 43 AFTE Journal at 287. Ostensibly, one hundred firearms toolmark examiners could hold one hundred different personal standards of when two sets of toolmarks sufficiently agree,  and all one hundred of these personal standards may accord with the AFTE Theory. Further, because the standard itself offers so little guidance on when an examiner should make an identification determination, some examiners may decide that the two sets of toolmarks were made by the same tool while others determine the toolmarks to be inconclusive and still others decide the toolmarks were made by different tools. To emphasize, these one hundred examiners could come to these contradictory conclusions without a single examiner running afoul of the AFTE Theory.

*Adams* at 1261-62, *quoting United States v. Shipp*, 422 F. Supp. 3d at 778-79.

### Error Rates

On the issue of error rates, the *Adams* court did not find dispositive studies purporting to show low rates of false positives.  In particular, *Adams* found that in the designs of such studies

"[t]he incentive structure for the testing process is also concerning. It appears to be the case that the only way to do poorly on a test of the AFTE method is to record a false positive. There seems to be no real negative consequence for reaching an answer of inconclusive. Since the test takers know this, and know they are being tested, it at least incentivizes a rate of false positives that is lower than real world results. This may mean the error rate is lower from testing than in real world examinations." *Adams* at 1248.

### Peer Review

On the factor of peer review, the *Adams* court noted that literature published in the AFTE Journal did not serve the purposes of "detecting substantive flaws" in AFTE methodology, and focused instead on "whether any studies being published used the correct, accepted methodology." Accordingly, this factor favored the defendant. *Id*. at 1264-65.

### Quality Control

*Adams* found the existence of certain "quality control mechanisms" with respect to the toolmark analyst's work in that case, but found this not to be dispositive, indicating that the weight attached to quality control mechanisms is tied to whether they "were applied to a scientifically testable methodology", which they were not. *Id.* at 1265

8

### General Acceptance

Finally, the *Adams* found an absence of "general acceptance" in the scientific community. The AFTE method that Mr. Gover uses has been widely accepted within his own community of technical experts. . . .. But it has been heavily criticized by other members of the broader scientific community for failing to yield reproducible results or a precisely defined process. Def.'s Br. at 6-7 (citing Nat'l Research Council, Ballistic Imaging 81 (National Academies Press 2008)); NRC Comm. on Identifying the Needs of the Forensic Sci. Cmty., Strengthening Forensic Science in the United States: A Path Forward 155 (2009)). In fact, these reports suggest to me that the widespread acceptance within the law enforcement community may have created a feedback loop that has inhibited the AFTE method from being further developed. On the other hand, widespread general acceptance within a given technical community could theoretically be sufficient. But that is more consistent with a *Kumho Tire* theory of expert testimony, not with *Daubert*. Here, where the scientific community at  large disavows the theory because it does not meet the parameters of science, I cannot find that the AFTE method enjoys "general acceptance" in the scientific community.

*See also* PCAST Report, *supra*, n.1.

### Limits on testimony imposed by *Shipp* and *Adams*

Both the *Shipp* court and the *Adams* court did not preclude the firearms examiner's testimony altogether, but imposed significant limits on the testimony.

*Adams* permitted the firearms examiner to testify to objective "observational evidence", such as the fact that the casings had "hemispheric firing pin impressions" and all had "six lands/grooves and a right twist", but  "[n]o evidence relating to [the analyst's] methodology or conclusions relating to whether the shell casings matched the Taurus will be admitted at trial." *Adams* at 1267.

9

In *Shipp* the court ruled that:

> Detective Ring may testify as to his process of examining the recovered firearm, determining its operability, and test firing it. He may also describe the theory of toolmark analysis and how firearms can leave markings on bullets and shell casings. He may further describe the process of comparing the recovered shell casing and bullet fragments to the test fires and identify the similarities between them. Finally, he may testify that the toolmarks on the recovered bullet fragment and shell casing are consistent with having been fired from the recovered firearm, and that the recovered firearm cannot be excluded as the source of the recovered bullet fragment and shell casing. However, Detective Ring may not testify, to any degree of certainty, that the recovered firearm is the source of the recovered bullet fragment or the recovered shell casing.

*Shipp*, 422 F. Supp. 3d at 782-83.

### Relief sought

In the present case, we seek preclusion of the firearm analyst's testimony or, alternatively, a hearing on the admissibility or scope of the analyst's testimony. .  If not precluded, we seek a limitation on the analyst's testimony along the lines of those imposed by *Adams* or, alternatively, *Shipp*.

**III. Section 922(g)(1) is unconstitutional**

Under 18 U.S.C. § 922(g)(1) it is "unlawful for any person – (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 2022 U.S. LEXIS 3055 (June 23, 2022), the Court held that the proper-cause requirement of New York's firearm licensing scheme violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their Second Amendment right to keep and bear arms in public for self-defense. *Bruen* established the following standard for applying the Second Amendment: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at *29.

In the pre-*Bruen* case of *Kanter v. Barr*, 919 F.3d 437, 451-69 (7th Cir. 2019), Judge (now Justice) Barrett dissented from an opinion affirming application of the felon-dispossession provision of Section 922(g)(1) – as well as a similar state law provision – to a non-violent felon.  Her dissent included a detailed historical analysis of proposals to restrict certain persons from possessing firearms that were raised at the time of the nation's founding, and concluded:

> Whatever else may be said about the particulars of each of these three proposals, they are most helpful taken together as evidence of the scope of founding-era

understandings regarding categorical exclusions from the enjoyment of the right to keep and bear arms. The concern common to all three is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury.

*Kanter* at 456.

The judge added:

History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons. But it does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous.

*Id.* at 464.

Section 922(g)(1) broadly prohibits any form of possession, shipment or receipt of any kind of firearm or ammunition and thus covers individual conduct that is protected by the plain text of the Second Amendment.   The statute is not tied to any finding of dangerousness; rather, it applies to the entire category of persons who have been convicted of offenses punishable by more than a year, no matter what the offense, what the circumstances, or how remote in time, and regardless anyone's individual history and characteristics.[2]  This statute cannot be justified as consistent with the nation's historical tradition of firearm regulation. It is unconstitutional.   Accordingly, the indictment must be dismissed.

---

[2]Felon-in-possession is a misnomer, as the statute says nothing about felonies, and simply defines the class of prohibited persons as those having convictions for offenses punishable by more than a year.

12

**Conclusion**

The defendant's pre-trial motions should be granted.

Dated:  White Plains, New York
July 5, 2022

*/s/ Theodore S. Green*
_____

Theodore S. Green
*Attorney for Darnell King*
Green & Willstatter
200 Mamaroneck Avenue - Suite 605
White Plains, New York   10601
(914) 948-5656
theosgreen@msn.com

cc: All counsel (by ECF)

13