UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

UNITED STATES OF AMERICA,

          -against-                                      21-CR-255 (NSR)

DARNELL KING,

             Defendant.

-------------------------------------------------------------X

Reply Memorandum of Darnell King in Support of Pre-Trial Motions

Theodore S. Green
*Attorney for Darnell King*
Green & Willstatter
200 Mamaroneck Avenue - Suite 605
White Plains, New York   10601
(914) 948-5656
theosgreen@msn.com

cc: All counsel (by ECF)

## I.  A *Wade* hearing is required

In our supplemental pretrial motions, we sought to have the government specify what identification evidence involving law enforcement procedures the government will seek to introduce at trial.

In its opposition, the government specifies two identification procedures:  1) a photo array shown to a civilian described as the shooting victim, and 2) an identification from a single "still" photograph by a detective.  Both of these procedures must be the subject of a *Wade* hearing.

While the government disclosed documentation of these, it was not clear to us from the discovery that they intended to offer them at trial.  Indeed, according to the police reports provided in discovery, the civilian did not claim to have seen the face of the shooter.  As stated in a police report (USAO_000188), the civilian, when asked whether he saw the person's face, responded: "I did not see his face", adding that he knows "Spike's voice."  The government's discovery, including video surveillance recordings, substantiates that the shooter was wearing a mask at the time of the shooting.  If the government seeks to offer trial evidence that the civilian identified the defendant from a photo array, or otherwise testify to being able to make a visual identification of the defendant, the reliability of the photo array procedure, and whether there exists an independent basis for the identification, must be explored at a *Wade* hearing.

The civilian witness denies seeing the shooter's face and only purports to base his claim on hearing a voice.  This begs the question of how the civilian was able to make an identification from a photo array,  what the nature of the identification was, and what was discussed between the witness and the police at the time of the "identification."  While the government has turned over a pre-printed checklist purporting to document the instructions that a detective is said to have "provided"

1

to the witness, which the witness reportedly signed after "receiving" them, it is not clear from either

the pre-printed form or the government's proffer whether the contention is that these were read to

the victim, or the victim was simply asked to read it to himself, or something else.  Further, it is

unclear how these instructions – which are geared towards facial identifications – could apply to, or

even make sense to, a person who did not see the suspect's face.

Moreover, a police report (USAO_078981), from another detective asserts that, immediately

prior to the "photo array", the detectives "conducted a verbal statement, which was recorded" but,

whatever was said between the detectives and the suspect at that time (other than the witness'

purported identification) is redacted from our copy of the report.  Nor we have received the recording

of that conversation.

With respect to the identification from a "still" photo by a detective, the government has been

unable to produce a copy of the "still" shot, a failure which  could well give rise to an evidentiary

sanction for its loss, and which should also be explored at the *Wade* hearing.  Moreover, a "still"

image implies that it is a frame captured from a video recording, and still frames from videos are

particularly subject to distortion and lack of clarity.

As stated in our main papers, single-photo identifications (which would include "still"

images) have long been "condemned" by our Circuit as unnecessarily suggestive absent "extenuating

circumstances."  *See United States ex rel. John v. Casscles*, 489 F.2d 20 (2d Cir. 1973), cert. denied,

416 U.S. 959, 40 L. Ed. 2d 310, 94 S. Ct. 1976 (1974).  There were no extenuating circumstances

justifying the showing of a single photograph to the detective.  Moreover, the government does not

get a pass on a *Wade* hearing simply because the purported identifying witness is a law enforcement

officer.  *See e.g. United States v. Williams*, 20-cr-662 (VB) (SDNY), ECF No. 24 at 8-10; ECF No.

2

25 (government conceded that single-photo viewing by undercover officer, made shortly after controlled buys, was unnecessarily suggestive and consented to a *Wade* hearing, which Court granted).

While the government claims that the civilian witness had "familiarity" with the defendant, and that the detective had previously observed the defendant on "multiple occasions", those claims should be examined at the *Wade* hearing. This is particularly so given the problematic circumstances of each identification. In the case of the civilian, there was no facial recognition, only a purported hearing of a voice, yet the government is somehow seeking to offer evidence of a facial ID made during a police-arranged procedure. And, in the case of the detective, we have all the potential for suggestion and misidentification brought on by a single-image ID, muddied further by the loss of that image, and the possibility that it was a "still" capture of a video, which would be especially vulnerable to distortion and lack of clarity. The government provides no detail on the detective's purported prior observations of the defendant, such as the number of occasions, when they occurred, or the viewing conditions. The circumstances of the identification, and the credibility and reliability of each witness' claims of prior knowledge of the defendant, must be tested at the hearing, and not adjudged solely on the government's proffer in a memorandum of law.

Accordingly, there should be a *Wade* hearing with respect to the identification procedures and independent source as to the civilian witness and the law enforcement officer.

## II.  Ballistics testimony should be precluded or limited

For the reasons stated in our main papers, we seek preclusion of toolmark comparison testimony or, in the alternative, a limitation on the testimony of the firearms examiner, in accordance

with *United States v. Adams*, 444 F. Supp. 3d 1248 (D. Oregon 2020) 1267, or, alternatively, *United*

*States v.  Shipp*, 422 F. Supp. 3d 762 (E.D.N.Y. 2019).

The government characterizes one of our alternative requests for a limitation of testimony

as seeking "to limit Detective Holzman from testifying to the degree of certainty of his conclusions."

Govt. Opposition Memorandum at 17.  This is not accurate.  Both of the alternative limitations we

seek (as set forth in *Adams* and *Shipp*) would prevent Holzman from expressing a conclusion that

the shell casings matched the firearm at all.  Rather, along the lines of *Adams*, Holzman's testimony

should be limited to "observational evidence", such as what he observed of the firing pin impressions

and ejection marks on the shell casing, but "[n]o evidence relating to [the analyst's] methodology

or conclusions relating to whether the shell casings matched the Taurus[.]" *Adams* at 1267.

Alternatively, along the lines of *Shipp*, Holzman should be limited to his observations of the

evidence, "the process of comparing" the shell casings, whether the shell casings "are consistent with

having been fired" from the firearm, and whether the firearm "cannot be excluded" as the source of

the shell casing.  However, Holzman "may not testify, to **any** degree of certainty, that the recovered

firearm is the source of the recovered . . . shell casing." *Shipp*, 422 F.Supp.3d at 782-83.  *See*

Defense Memorandum at 9-10. [emphasis added]

The government claims the issue can be addressed by having the ballistics examiner testify

to his purported conclusions without expressing his degree of certainty about the conclusions, while

allowing the witness to express his purported degree of certainty if the topic is opened up by cross

examination.  Government Memorandum at 18.   But, going by Holzman's report, the government

wants to have Holzman express the conclusion that he has "identified" the shell casings as having

been fired from the Taurus firearm, which he should not be permitted to do.. *See* Govt.

Memorandum at 9.  The government's proposal is really no limitation at all and wholly inadequate to address the problems with toolmark comparisons identified in *Adams* and *Shipp.*

### III.  Section 922(g)(1) is unconstitutional

The government cites to our Circuit's pre-*Bruen* decision upholding the constitutionality of 18 U.S.C. § 922(g)(1) – *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (per curiam) – as well a *dicta* from pre-*Bruen* opinions and concurrences concerning whether laws prohibiting firearm possession by convicted felons would be permissible. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (plurality) quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *see also N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2162 (2022) (Kavanaugh, *J.*, concurring).

The fact remains that six Justices joined the *Bruen* opinion, holding that the standard for applying the Second Amendment is as follows: "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen* at 2126.

Following *Bruen*, the government carries the burden of justifying a regulation by demonstrating it consistency with the Nation's historical tradition of firearm regulation. That burden cannot be met by resort to pre-*Bruen* holdings and *dicta*.

As set forth in our main papers, then-Judge Barrett's dissenting opinion in *Kanter v. Barr*, 919 F.3d 437, 451-69 (7th Cir. 2019), addresses the relevant historical tradition with respect to a

felon-in-possession statutory scheme, and is persuasive here.

Because Section 922(g)(1) provides for a blanket prohibition against firearm possession by all persons with prior convictions punishable by more than one year, with no exceptions and without regard to the persons individual history and characteristics (and no mechanism to evaluate that history and those characteristics) it is facially unconstitutional and the defendant need not resort to an as-applied challenge. Nonetheless, contrary to the government's assertion, King should prevail on an as-applied challenge as well. King's criminal history includes one felony for criminal possession of a weapon in the third degree (NY Penal Law § 265.03). This offense punishes the simple possession of a firearm and applies to any person in New York state who is unlicensed. It is bound up with New York's licensing scheme, and that licensing scheme has been found unconstitutional. King's simple possession of a weapon – a crime that has no aggravating factors connected to the possession or use of the weapon – should not be the kind of prior offense that would preclude King's subsequent constitutional right to possess a firearm. King's other felony conviction – for criminal possession of a controlled substance in the fifth degree (NY Penal Law § 220.06, subd. 5) – punishes the simple possession of 500 milligrams (that is, one-half gram) of cocaine. This offense has no element of distribution or possession with intent to distribute, and the small statutory quantity is not probative of intent to distribute. Accordingly, this offense should not bar King from exercising his constitutional right to bear arms. Finally, the government cites to a misdemeanor menacing conviction, an offense that, apart from not being a felony, is not considered a violent offense in New York and has no element of causing or attempting to cause injury. All three convictions, either cumulatively or separately, are insufficient to deprive King of his Second Amendment rights.

## IV. Conclusion

For the reasons stated herein, the defendant's supplemental pretrial motions should be granted.

Dated: White Plains, New York
       August 23, 2022

                                            /s/ *Theodore S. Green*

                                        _____

                                        Theodore S. Green
                                        *Attorney for Darnell King*
                                        Green & Willstatter
                                        200 Mamaroneck Avenue - Suite 605
                                        White Plains, New York   10601
                                        (914) 948-5656
                                        theosgreen@msn.com

cc: All counsel (by ECF)