```
                                        USDC SDNY
                                        DOCUMENT
                                        ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT            DOC #: _____
SOUTHERN DISTRICT OF NEW YORK           DATE FILED:  10/6/2022
```

UNITED STATES OF AMERICA,

    -v.-　　　　　　　　　　　　　　　　　21-CR-255 (NSR)
　　　　　　　　　　　　　　　　　　　　　OPINION & ORDER
DARNELL KING,

                     Defendant.

NELSON S. ROMÁN, United States District Judge:

Defendant Darnell King ("Defendant") was charged on April 7, 2021, with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Complaint, "Compl.," ECF No. 2.) On July 5, 2022, Defendant filed the instant motion to suppress, seeking to (1) direct disclosure of identification procedures or a *Wade* hearing; (2) preclude or limit opinion testimony regarding firearm toolmark analysis; and (3) dismiss the indictment on the ground that 18 U.S.C. § 922(g)(1) is unconstitutional. (ECF No. 38.) For the following reasons, Defendant's motion to suppress is DENIED.

## BACKGROUND

The Complaint alleges that on or about March 12, 2021, an individual ("Victim-1") was shot in the stomach and the leg in Mount Vernon. (Compl. ¶ 4.) Mount Vernon Police Department ("MVPD") officers responded to reports of an individual having been shot. (*Id*.) Upon arriving, the officers found Victim-1 on the floor of a bodega bleeding from his gunshot wounds. (*Id*.) MVPD was able to identify security cameras and reviewed video footage. (*Id*. ¶ 3.)

From approximately 4:10 PM until 4:13 PM, a black male dressed in dark, ripped jeans, a black sweatshirt, and black ski mask ("Suspect-1") is seen on security video removing his ski

mask. (*Id*. ¶ 4.) From approximately 4:13 PM through 4:17 PM, Suspect-1 is seen getting closer and closer to the shooting location. (*Id*.) Once arriving at the location, Suspect-1 is seen hiding behind a parked car as Victim-1 crossed towards him. (*Id*.) As Victim-1 approached the parked car, Suspect-1 emerged and grabbed Victim-1 by the collar and pulled him onto the sidewalk. (*Id*.) The two struggled before Victim-1 tried to run away, grabbed his stomach, and then fell to the ground. (*Id*.) At the same time, two bystanders ran from the area and ducked for cover. (*Id*.) Suspect-1 then ran away. (*Id*.) At approximately 4:19 PM he reappeared on video and is seen at the end of an alleyway that contained a small crawl space. (*Id*.) He later jogs away. (*Id*.)

Later that afternoon, MVPD officers responded to the alleyway, and recovered a firearm in the small crawl space. (*Id*.) The firearm is a Taurus Model G2C pistol. (*Id*.) MVPD also identified Suspect-1 to be Defendant. (*Id*.) Two identifications took place. In the first identification, Victim-1 was shown a six-photo array, from which Victim-1 identified the picture of the Defendant. (ECF Nos. 43, 46.) In the second identification, a Mount Vernon Police Department (MVPD) detective was shown a still photograph captured from the security camera footage. (Gov. Opp. at 4, ECF No. 43.) The MVPD detective[1] identified the suspect in the photograph as Defendant. (*Id*. at 5.)

Defendant was previously convicted of criminal possession of a weapon in the second degree and sentenced to nine years' imprisonment, and criminal possession of a controlled substance in the fifth degree and sentenced to two years' imprisonment. (*Id*. ¶ 7.)

---

[1] The Government states that the MVPD detective is "familiar with the defendant from having observed him in Mount Vernon on 'multiple occasions.'" (Gov. Opp. at 4-5, ECF No. 43.) The Government further provides that it is working to obtain a copy of the photograph that was shown to the detective and will promptly produce it to the Defendant. (*Id*. at 5, n.3.)

On April 7, 2021, Magistrate Judge Krause signed the Complaint charging Defendant with one count of being a felon in possession of a firearm in violation of Title 18, United States Code Section 922(g)(1). (*Id.* at 6.) Defendant was arrested on April 8, 2021. (*Id.*)

On July 5, 2022, Defendant filed the instant motion to suppress. (ECF No. 38.) The Government filed an opposition on August 9, 2022 (ECF No. 43), and Defendant filed a reply on August 23, 2022 (ECF No. 45.) On August 31, 2022, the Government provided the Court and Defendant with a copy of the video of Victim-1's identification of Defendant. (ECF No. 46)

## DISCUSSION

Defendant seeks to (1) suppress the two identifications or direct a *Wade* hearing; (2) preclude or limit opinion testimony regarding firearm toolmark analysis; and (3) dismiss the indictment on the ground that 18 U.S.C. § 922(g)(1) is unconstitutional. The Court examines each in turn.

### A. Identification Procedures

Upon the Government's disclosure of the identification video, Defendant avers that because Victim-1 only saw "a man with a ski mask" and recognized Defendant instead by his voice, the inclusion of Defendant's photo in the identification array was unduly suggestive. The Court disagrees.

Due process protects criminal defendants from suggestive police identification procedures. *Simmons v. U.S.*, 390 U.S. 377, 384 (1968). In examining a motion to suppress identification evidence, the Court must determine whether "the pretrial identification procedures were unduly suggestive of the suspect's guilt." *United States v. Maldonado-Rivera,* 922 F.2d 934, 973 (2d Cir. 1990). "If the pretrial procedures were not suggestive, any remaining questions as to reliability . . . go to the weight of the identification and not to its admissibility, and the identification therefore

3

is generally admissible without any further reliability inquiry." *United States v. Thai,* 29 F.3d 785, 808 (2d Cir. 1994). "If the court finds, however, that the procedures were suggestive, it must then determine whether the identification was nonetheless independently reliable." *Raheem v. Kelly,* 257 F.3d 122, 133 (2d Cir. 2001). "In sum, the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." *Id.* Absent a contested issue of material fact as to the suggestiveness of pretrial identification procedures, a defendant is not "automatically entitled to an evidentiary hearing on the claim." *United States v. Hall*, No. 14 CR 105, 2014 WL 2464943, at *2 (S.D.N.Y. May 13, 2014) (internal citations omitted). *See also United States v. Castellano,* 610 F. Supp. 1359, 1439 (S.D.N.Y. 1985) ("A defendant who seeks to suppress evidence bears the burden of showing that disputed issues of material fact exist before an evidentiary hearing is required.").

In evaluating whether a photographic array was unduly suggestive, a court must consider several factors, including the size of the array, the manner of presentation by the officers, and the contents of the array. *United States v. Thai*, 29 F.3d at 808 (citing *See United States v. Concepcion,* 983 F.2d at 377; *United States v. Maldonado–Rivera,* 922 F.2d at 974). If there is nothing inherently prejudicial about the presentation, "such as use of a very small number of photographs, or the utterance of suggestive comments before an identification is made, the principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit. " *Id.* at 808 (internal citations and quotations omitted).

Here, the disclosed video shows that Victim-1 indicated that he saw a man in a ski mask, and that he recognized the voice as Defendant's because Victim-1 had known Defendant for 15

years. The detectives then read to Victim-1 the identification procedures instructions in a plain and neutral fashion before showing Victim-1 a six-photo array. From the array Victim-1 identified one photograph. There is nothing prejudicial about the detectives' presentation of the photos, and Defendant does not allege that the photos shown to Victim-1 so stood out from the other photos as to suggest that Defendant was the culprit. The fact that Victim-1 first recognized the Defendant by his voice goes to the identification's weight, and not to its admissibility. *Thai* at 808. Indeed, if there was "already such a definite image of the defendant in the witness' mind" prior to any allegedly suggestive identification procedures, the identification would be more—and not less, as Defendant erroneously argues—reliable, for "it is the likelihood of misidentification which violates the defendant's right to due process." *U. S. ex rel. John v. Casscles*, 489 F.2d 20, 24 (2d Cir. 1973) (citing *Neil v. Biggers*, 409 U.S. at 198).

Defendant's challenge of the second identification by the MVPD detective is also misplaced. If the identifying detective, prior to being shown the single still capture photo, already had a definite image of the Defendant in his mind due to the detective's familiarity with Defendant, such familiarity lowers the likelihood of misidentification. *Casscles*, 489 F.2d at 24. Stated differently, while Defendant is free to challenge the weight to be given to the MVPD detective's identification, the alleged low quality of the photo alone does not make the identification unduly suggestive or inadmissible.

Accordingly, the Court finds that the disclosed identification procedures were not unduly suggestive and denies Defendant's motion to preclude the identification. Because the identification is therefore "admissible without any further reliability inquiry," *Thai* at 808, Defendant's motion for a *Wade* hearing is also denied.

### B. Admissibility of Ballistic Testimony

Defendant next sought to preclude toolmark comparison[2] testimony from a firearms examiner, MVPD Detective Arthur Holzman ("Detective Holzman"), or alternatively, to limit the scope of the Detective Holzman's testimony.

Toolmark analysis is "a [forensic] procedure by which an examiner seeks to determine whether an evidentiary sample (e.g., from a crime scene) is or is not associated with a source sample (e.g., from a suspect) based on similar features." *United States v. Shipp*, 422 F. Supp. 3d 762, 770 (E.D.N.Y. 2019) (internal citations and quotations omitted). In the instant case, the two samples compared by Detective Holzman are two spent shell casings. The first shell casing (Shell Casing #1) was recovered from the shooting scene. (Compl. ¶ 4.) The second shell casing (Shell Casing #2) was recovered from the chamber of a Taurus Model G2C pistol ("the Pistol"). (*Id.*) The Pistol was in turn recovered from a small crawl space in which Defendant was videoed by the security camera. (*Id.*)

Detective Holzman, after "microscopically examined and compared" the two shell casings in a toolmark analysis, determined that Shell Casing #1 was fired from the Taurus Model G2C

---

[2] Specifically, firearm toolmark identification is "based on the theory that tools used in the manufacture of a firearm leave distinct marks on various firearm components, such as the barrel, breech face or firing pin. The theory further posits that the marks are individualized to a particular firearm through changes the tool undergoes each time it cuts and scrapes metal to create an item in the production of the weapon. Toolmark identification thus rests on the premise that any two manufactured products, even those produced consecutively off the same production line, will bear microscopically different marks. With regard to firearms, these toolmarks are transferred to the surface of a bullet or shell casing in the process of firearm discharge. Depending on the tool and the type of impact it makes on the bullet or casing, these surface marks consist of either contour scratch lines, known as striations (or striae), or impressions. For example, rifling (spiraled indentations) inside of a gun barrel will leave raised and depressed striae, known as lands and grooves, on the bullet as it is fired from the weapon, whereas the striking of the firing pin against the base of the cartridge, which initiates discharge of the ammunition, will leave an impression but not striae.
    An examiner observes three types of characteristics on spent bullets or cartridges: class, subclass and individual. Class characteristics are gross features common to most if not all bullets and cartridge cases fired from a type of firearm, for example, the caliber and the number of lands and grooves on a bullet. Individual characteristics are microscopic markings produced in the manufacturing process by the random imperfections of tool surfaces (the constantly changing tool as described above) and by use of and/or damage to the gun post-manufacture.... Subclass characteristics generally fill the gap between the class and individual characteristics categories. They are produced incidental to manufacture but apply only to a subset of the firearms produced, for example, as may occur when a batch of barrels is formed by the same irregular tool." *United States v. Shipp*, 422 F. Supp. 3d at 769–70 (quoting *United States v. Otero*, 849 F. Supp. 2d 425 (D.N.J. 2012), aff'd, 557 F. App'x 146 (3d Cir. 2014)).

pistol. (Compl. ¶ 5.)  Detective Holzman concluded, in his report, that (1) the toolmarks of Shell Casing #1 and Shell Casing #2 "originated from the same source"; and (2) that such an "identification" constitutes Detective Holzman's "opinion that the probability that the two toolmarks were made by different sources is so small that it is negligible." (Gov. Opp. at 9.) Defendant seeks to preclude Detective Holzman from testifying to his opinion, "to any degree of certainty," that Shell Casing #1 was fired from the Pistol. (Def. Reply at 4, ECF No. 45.)

Here, the Court need not engage in a *Daubert* analysis with respect to toolmark analysis procedure, because, as the Government correctly points out in its opposition, "[e]very federal court to have examined the issue in a written opinion. . . [has concluded] that ballistic toolmark analysis is sufficiently plausible, relevant, and helpful to the jury to be admitted in some form." *United States v. Willock*, 696 F. Supp. 2d 536, 568 (D. Md. 2010). Indeed, Defendant cited no case in which the firearm toolmark analysis testimony was excluded in its entirety. The real question before the Court is whether Detective Holzman may offer his opinion that, based upon his observation during the toolmark comparison, Shell Casing #1 was fired from the Pistol.

Under Fed. R. Evid. 702, an expert's testimony must, *inter alia*, be "based upon sufficient facts or data" and be "the product of reliable principles and methods" be admissible. *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 318–19 (S.D.N.Y. 2009), *aff'd*, 976 F.3d 239 (2d Cir. 2020) "When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Amtrak,* 303 F.3d 256, 266 (2d Cir. 2002). An expert's analysis must be "reliable at every step," and although "[a] minor flaw in an expert's reasoning ... will not render an expert's opinion per se

7

inadmissible," exclusion is nevertheless warranted whenever "the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* at 267 (citation omitted).

Here, Defendant, while extensively citing *Shipp* and *Adams*, does not argue that Detective Holzman reached his conclusion on inadequate data. (Def. Mem. at 9-10.) Thus, the Court has no basis to limit Detective Holzman's testimony.

Accordingly, Defendant's motion to preclude or to limit Detective Holzman's ballistic testimony is denied.

### C. Constitutionality of 18 U.S.C. § 922(g)(1)

Defendant lastly sought to dismiss the indictment on the ground that 18 U.S.C. Section 922(g)(1) is unconstitutional, both facially and as applied to Defendant. Both arguments fail to pass muster.

The Supreme Court unequivocally validated the felon disarmament laws in *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), and *D.C. v. Heller*, 554 U.S. 570 (2008), twice reassuring that its decisions interpreting the Second Amendment should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" *Heller*, 554 U.S. at 626. The subsequent *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* majority opinion does not expressly address the issue of felon disarmament. 142 S. Ct. 2111 (2022).

Here, Defendant essentially argues that *Bruen* should be taken to "cast doubt on longstanding prohibitions on the possession of firearms by felons" in marked departure from *McDonald* and *Heller*. *Cf. McDonald*, 561 U.S. at 786; *Heller*, 554 U.S. at 626. This argument is meritless. First, the *Bruen* majority opinion makes abundantly clear that *Heller* and *McDonald* stand as controlling precedents. *See Bruen* at 2134. Second, the *Bruen* majority repeatedly notes that the petitioners are "law-abiding" citizens. *See, e.g., Bruen* at 2119, 2120, 2122, 2125, 2131.

Third, Justice Alito, in his concurrence opinion, explicitly clarifies that *Bruen* does not "disturb anything . . . in *Heller* or *McDonald v. Chicago* . . . about restrictions that may be imposed on the possession or carrying of guns." *Bruen* at 2157. Fourth, Justice Kavanaugh, joined by Chief Justice Roberts, reiterates in his concurrence that "the Second Amendment allows a 'variety' of gun regulations" as prescribed by *Heller*. *Bruen* at 2162. 18 U.S.C. Section 922(g)(1) is among such regulations that have been found constitutional by the Second Circuit in *United States v. Bogle*, 522 F. App'x 15, 17 (2d Cir. 2013). *See also United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) (citing *Bogle* as precedent "uphold[ing] the federal ban on ex-felons' access to firearms and ammunition"). Accordingly, 18 U.S.C. Section 922(g)(1) is constitutional.

Defendant's as-applied challenge also has no merit. Defendant has two felony convictions, both of which are crimes "punishable by imprisonment for a term exceeding one year," 18 U.S.C.A. § 922 (West), and fall squarely within 18 U.S.C. Section 922(g)(1). Thus, Section 922(g)(1) is not unlawful as applied to Defendant.

Accordingly, Defendant's motion to dismiss the indictment is denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is DENIED. The Clerk of Court is respectfully directed to terminate the motion at ECF No. 38.

Dated: October 6, 2022  
White Plains, New York

SO ORDERED:

_____  
NELSON S. ROMÁN  
United States District Judge